## THEODORE J. PANASUK'S CASE.

Suffolk.   March 17, 18, 1914.— May 21, 1914.

Present: RUGG, C. J., HAMMOND, LORING, SHELDON, & CROSBY, JJ.

*Workmen's Compensation Act. Statute,* Construction. *Words,* "Furnish."

Under the provision of the workmen's compensation act contained in St. 1911, c. 751, Part II, § 5, that "during the first two weeks after the injury, the association shall furnish reasonable medical and hospital services, and medicines when they are needed," although the employee generally is not permitted to select his own physician or hospital, yet, where the injured employee is an illiterate foreigner, who is unable to read, write or understand the English language, and no such notice is given of the names and addresses of physicians to go to in case of an accident as would challenge the attention even of a person who understood English, and where the employee reports his injury to the foreman, who does not advise him in regard to his right to medical attendance,

and, no effort being made by the insurer to furnish medical service, the employee at the suggestion of a fellow countryman goes to the office of a physician who gives him the necessary treatment during the first two weeks after his injury, a decision upon these facts by the Industrial Accident Board, confirmed by a decree of the Superior Court, that the insurer should pay the employee the sum of $22.50 on account of medical services rendered by this physician during the first two weeks after the injury, discloses no reversible error.

The workmen's compensation act is a remedial statute and should be given a broad interpretation.

Under the provision of the workmen's compensation act contained in St. 1911, c. 751, Part II, § 5, that "during the first two weeks after the injury, the association shall furnish reasonable medical and hospital services, and medicines when they are needed," the word "furnish" imports something more than a passive willingness to respond to a demand, and implies some degree of active effort to bring the required relief to the injured employee. In a case where this interpretation was applied, it was *said*, that, inasmuch as the insurer has readily accessible means of ascertaining the nationality of the employees insured by it and their degree of intelligence, if there are among them foreigners who cannot read or speak the English language, this circumstance requires greater effort on the part of the insurer in order to comply with the statute.

APPEAL to the Superior Court under St. 1911, c. 751, Part III, § 11, as amended by St. 1912, c. 571, § 14, from a decision of the Industrial Accident Board.

The case was heard by *Wait*, J. The material facts found by the Industrial Accident Board, who adopted the findings of the committee of arbitration, are stated in the opinion. Upon these facts the Industrial Accident Board found that the insurer did not furnish medical attendance to the employee, and that there was due to the employee from the insurer the sum of $22.50 on account of medical services rendered by Dr. Joseph B. Sayles during the first two weeks after the injury, to wit, from March 25, 1913, to April 7, 1913, and two days' compensation at half the employee's average weekly wage of $8.25, which was $1.44, the total amount due being $23.94.

The judge made a decree confirming the finding of the Industrial Accident Board and ordering that the insurer pay to the employee the sum of $23.94. The insurer appealed.

*E. C. Stone*, for the insurer.

*L. Swig*, for the employee.

RUGG, C. J. This is a proceeding under the workmen's compensation act. Panasuk received injuries arising out of and in the course of his employment in the service of the Taunton Wool Stock Company. A splinter became embedded in his hand, resulting

in swelling, pain and a "palmer abscess," which required a surgical operation, and thereafter cleansing and dressing for several days. Panasuk was found by the Industrial Accident Board to have been "an illiterate foreigner who was unable to read, write or understand the English language," and he had no notice, and no information was given him, as to how he should proceed in case of accident, nor had he been informed as to the manner in which he could procure medical attention. There was posted in a glass case near a desk in front of the place where the employee worked the following typewritten

"Notice to Employees.

"The Taunton Dye Works & Bleachery Company has provided for payment to injured employees by the American Mutual Liability Insurance Company, 50 State St., Boston, Mass., the compensation allowed by Part II of Chapter 751, of the Acts of 1911 and amendments thereto.

Taunton Dye Works & Bleachery Company.
June 26, 1912."

" Doctors to whom to go in case of accident and receive free medical treatment.

1. Dr. T. J. Robinson, 56½ Broadway.   Telephone 525.
2. Dr. T. F. Clark, 62 Broadway.   Telephone 211.
3. Dr. A. S. Deane, 60 Broadway.   Telephone 984-M."

The Taunton Wool Stock Company, for which Panasuk worked, and the Taunton Dye Works and Bleachery Company are separate corporations. Panasuk reported his injury to the foreman, who did not advise him respecting his right to medical attendance, and no effort was made to furnish medical service. Later, through the assistance of a fellow countryman, he went to the office of Dr. Joseph B. Sayles, who found that there was urgent necessity for an immediate operation to prevent a serious condition which might require amputation of the hand or arm, and who gave the necessary treatment. Dr. Sayles wrote to the superintendent of the employer that he had such a patient under the workmen's compensation act. But no attendance was offered to the employee. The only question raised is whether the amount paid to Dr. Sayles for medical attendance by the employee during the first two weeks after his injury can be recovered.

It is contended that the arbitration committee and the Industrial Accident Board' have no jurisdiction to consider this question. That contention is untenable. The purpose and scope of the workmen's compensation act is to include all matters touching the relations between the employer and employee arising under the act. It is a remedial statute and should be given a broad interpretation. All controversies arising between the employee and the employer and the insurer under the terms of the act are to be settled in accordance with the procedure there established. This follows from general considerations touching the nature of the legislation and the aim intended to be accomplished by it. A critical examination of Part II of the act, which relates to "payments," confirms this view. Section 1 provides that when an employee receives a personal injury arising out of and in the course of his employment he shall be paid compensation "as hereinafter provided." Sections 2, 3 and 4 relate to "compensation." Section 5 has to do with the medical and hospital services and medicines, and § 6 with the payments based upon the average weekly wage. The collocation of § 5 and its subject matter show that its benefits are a part of the compensation to which the workman is entitled.

Section 5, Part II, of the act is as follows: "During the first two weeks after the injury, the association shall furnish reasonable medical and hospital services, and medicines when they are needed." The plain purpose of this section is to impose upon the insurer the duty of providing these necessities for the workman. Manifestly the workman is not permitted generally to select his own physician nor hospital, but is to accept that which the law thus requires to be provided for him.

The question of difficulty is whether the insurer in fact did "furnish reasonable medical . . . services" as required by the act. The point has not been raised that it has not been found by the Industrial Accident Board that the notice quoted above was made for the benefit of the employer, the Taunton Wool Stock Company, for which Panasuk worked, nor that the statement, if made on its behalf, was true. Counsel for the employee and the insurer have argued as if this question of law were open, and we so treat it.

The obligation to furnish medical and hospital services for

the first two weeks after the injury is imposed on the insurer by the express words of the act. This duty must be performed or reasonable efforts made to that end before the statutory obligation is satisfied. "Furnish" means to provide or supply. Its significance may vary with the connection in which it is found. It is used here to describe a duty placed upon an insurer respecting a workman who receives "a personal injury arising out of and in the course of his employment." Such a person manifestly is presumed by the act to be under more or less physical disability and hence not in his normal condition of ability to look out for himself. The word "furnish" in such connection imports something more than a passive willingness to respond to a demand. It implies some degree of active effort to bring to the injured person the required humanitarian relief. Reasonably sufficient provision for rendering the required service must of course be made. Then either express notice must be given to the employee or there must be such publication or posting of the information as warrants the fair inference that knowledge has reached the employee. Where the insurer has made adequate arrangements for the care of those to whom the duty is owed in the event of injury, and then by conspicuous notices suitably posted in places frequented by the employee in a language capable of being read by him has given full information of that fact and directions as to steps to be taken by an injured person in order to avail himself of these arrangements, a very different question would be presented. This might go a long way toward proving compliance with the requirement of the statute. But, in the case at bar, the notice appears not to have been of a character to challenge attention, although perhaps it might have been enough if the employee had been able to read the English language. The insurer has readily accessible means of ascertaining the nationality of employees insured by it and their degree of intelligence. If among them are those who cannot read or speak the English language, this circumstance requires greater effort on its part in order to comply with the statute. *Beers* v. *Isaac Prouty Co.* 200 Mass. 19.

Under all the conditions disclosed, no reversible error appears.

*Decree affirmed.*