## No. 16,518.

Baeza et al. *v*. Remington Arms Company et al.

(224 P. [2d] 223)

Decided October 30, 1950.

Mr. L. F. BUTLER, for plaintiff in error Baeza.

Mr. JOHN METZGER, Attorney General, for plaintiff in error Industrial Commission.

Messrs. McCOMB, NORDMARK & ZARLENGO, for defendants in error.

*En Banc.*

MR. JUSTICE JACKSON delivered the opinion of the court.

THIS is an industrial commission case. Claimant suffered an injury to his left foot in an accident arising out of and in the course of his employment on August 28, 1945. This was admitted by both the employer and the insurance carrier at the hearing before a referee February 27, 1946. The referee entered an order finding that claimant had injured his left foot; that he lost no time from work, and sustained no permanent disability as a result of the accident. The award dated March 2, 1946, was for medical expense only, and was supported by the testimony of Doctors Newcomer and Newcomer, X-ray specialists, and Doctor Frederick H. Good. The Newcomer report included the following statement: "There is no X-ray evidence of fracture or dislocation of the bones taken. If there have been previous fractures of any of these bones they have healed without leaving any evidence of fractures." The record is devoid of a petition for a review of the referee's findings, nor does it disclose any award of the commission based thereon. Both sides, as well as the commission itself in its subsequent proceedings, have apparently assumed that those documents are in existence although not in the record.

On October 18, 1948, claimant filed a petition seeking to reopen the case, attaching to his petition a medical report of Doctor I. E. Rosen. The commission refused to reopen the case. January 13, 1949, claimant filed another petition to reopen—again attaching Doctor Rosen's report. The case was thereafter reopened on the commission's own motion, and a hearing was held before a referee April 8, 1949, with subsequent hearings August 24, 1949, and October 19, 1949. The referee, by an order entered November 3, 1949, denied compensation for the disability then existing on account of the condition of claimant's ankle. The order erroneously recited that the accident occured prior to claimant's military service instead of afterwards. Following the filing of a petition for review, the commission, January 3, 1950, entered findings of fact, vacated the order of the referee, and awarded compensation at the rate of $14.00 per week for the disability in claimant's ankle, and medical, surgical and hospital expenses not exceeding $500. An action was thereafter begun in the district court in the City and County of Denver, by which it was sought to set aside and vacate the award of the commission; such a judgment was subsequently entered, and the claim for compensation was dismissed. It is this latter judgment that claimant and the commission now seek to have reversed.

Claimant's testimony in the 1949 hearing was to the effect that he was a veteran of World War II, in which he served two years and seven months, and was discharged from the army because of his health, having received hospital treatment while in the army when he was troubled with his eyes, headaches and hemorrhoids, but that he had had no trouble with his left ankle prior to his accident in 1945. At the time of the accident he was a civilian and had been discharged from the army. He furthed testified that he continued to have pain in his foot and ankle after the accident; that following the accident he was given another job that kept him less on

his feet; that he suffered no diminution of salary when he shifted jobs. When he took new employment he still felt pain in his left foot and ankle and finally when pain developed in his back he went to Fitzsimons General Hospital, managed by the Veterans Administration. He was there treated in July, 1948, and operated upon September 14, 1948. He admitted that he had not requested help from his employer or the insurance carrier prior to seeking aid from the Veterans Administration, and that he had gone to the latter of his own accord. The nature of the operation was a tibia-talus fusion to immobilize the left ankle, with the result, as is admitted by all parties involved in this litigation, that claimant now has a permanent disability in the left ankle—the first question being whether or not this disability, resulting from the surgical operation, is connected with the accident of August 28, 1945.

The court found: 1. That there was no evidence to support the Industrial Commission's findings that Baeza sustained temporary or permanent disability as the result of an accident occurring on August 28, 1945; 2. that there was no evidence showing that any disability that Baeza then had was the result of an accident which he sustained on August 28, 1945; 3. that the accidental injury of August 28, 1945, resulted in no temporary or permanent disability.

Claimant's evidence consisted of his own testimony and that of Captain Doctor I. E. Rosen, of Fitzsimons General Hospital.

Counsel for claimant lays stress on the Fitzsimons General Hospital record, from which Doctor Rosen read as follows: "History revealed that the patient was well until August 1947 when he had gradual onset of lumbar back pain, of the right longitudinal muscle group of the back, most acute in the right flank just under the costal margin. X-ray of the spine here at Fitzsimons General Hospital revealed a mild arthritis of the lower fourth and fifth dorsal vertebrae. This is not considered severe

enough to account for the patient's pain. The patient also gave the history of having fractured his left ankle in 1945 while a civilian. Since it was felt that the pain in the patient's right flank was the result of postural strain due to the favoring of the left ankle, the patient's left ankle was immobilized in a short leg walking cast with the right shoe built up so that the weight lines were symmetrical. Under this treatment the patient became completely asymptomatic so it was felt that the patient would get good results from a tibia-talus fusion. This was done 14 December 1948. Patient was then placed in a long leg cast and discharged from the hospital with the understanding that he would return in two months for evaluation and further treatment, which he did." The doctor also testified: "The physical examination and other studies, as far as the x-rays revealed, he was at one time previously, evidently at sometime—not evidently very recently, but at least one year previously, the patient had had an injury to the left ankle; whether that injury was a fracture or not could not be determined because of his fracture line visible in the x-ray at that time; the only evidence we had was some calsification in the little ligaments of his ankle, called deltoid ligaments, which was reaction of trauma. What was the cause of that trauma we were not able to determine."

It should be noted that Doctor Rosen prefaced his recital of the foregoing history and record by the following statement: "I want you to understand, of course, that this is the patient's history, as given to me, not necessarily what may be true. It is what the patient tells us when he is admitted to the hospital."

After detailing the foregoing record, the doctor gave the following testimony on direct examination: "Q. Well, Doctor, I assume from your position here that you feel that this condition as you found it was due to trauma that pre-existed your examination? A. I do. Q. Is it logical and consistent with your opinion in this matter that the claimant could have had an accident or an

injury to his ankle about August 28, 1945 which would result in this condition as you found it? A. It might be true; might fit in with it. But whether it is or not I can't say."

This testimony of claimant's physician would not seem to justify the Industrial Commission in rejecting the findings of its referee and making new findings of its own. The gist of Doctor Rosen's testimony is that there was a possibility that an accident or injury to the ankle on August 28, 1945, could have resulted in the condition of the ankle as he found it in 1948. In the recent cases of *Polz v. Donnelly,* 121 Colo. 95, 213 P. (2d) 385; *Coakley v. Hayes,* 121 Colo. 303, 215 P. (2d) 901; and *Russell v. Phillips,* 121 Colo. 342, 216 P. (2d) 424, we have applied the rule that evidence of a mere possibility of a fact having occurred or a condition having existed, is not sufficient to support a judgment, and we have recently applied this rule in *United States Fidelity & Guaranty Company v. Industrial Commission,* 122 Colo. 31, 219 P. (2d) 315.

Counsel for claimant takes the position that the evidence given by Doctor Rosen conflicts with that of Doctor Good and Doctor Barnard, whose testimony was offered in behalf of the employer and the insurance carrier. Doctor Good's testimony was to the effect that he found a decided disability of the claimant as a result of the operation; that he "estimated his permanent disability as of April 26, 1949, to be 50 percent of the left leg at the ankle, which will probably not improve." As to the cause of the disability, he testified: "I think it is a combination of two things. I think it is an inch and a half shortening of his left leg and fusion of his left ankle." Doctor Good's summary reads: "It is my opinion that his present disability and the disability which he had prior to his operation on Sept. 14, 1948, are not related to the original injury of Aug. 28, 1945."

Doctor Hamilton L. Barnard, an orthopedic surgeon of Denver, interpreted the original medical report, dated

November 12, 1945, as follows: "It means he had a fracture of the big toe, which is very common, and I don't think has any bearing on the ankle, and a fracture of the os calcis. Well, the os calcis does not run into the ankle joint. It is a joint below the astragalus, and that joint now is all right. Apparently, from that report, the fracture doesn't extend into the true ankle joint. I couldn't see why it would damage the ankle joint. It usually damages the subastragalar joint, which necessitates a fusion sometimes in the subastragalar joint, and I can't see why it would affect the ankle joint. That means it is a fracture of the heel bone in the anterior portion of it below the ankle, and that joint permits the foot to turn in and out. It has nothing to do with this joint going up and down, which they [the surgical department at Fitzsimons General Hospital] later fused." Doctor Barnard's conclusion was as follows: "In view of the fact that the man had a minor injury to his ankle, was able to work for almost three years without having consulted a doctor, that there is a lack of evidence of any destructive injury in or around the ankle joint, it is my opinion that the accident in August, 1945, did not have anything to do with the ankylosing disability in the ankle. The shortening of the left lower extremity is undoubtedly congenital or was acquired early in life, and has nothing to do with the injury. Therefore, although the man does have a considerable amount of disability in the ankle, I feel that it is not the result of the injury of August, 1945."

We do not agree with counsel for claimant, that the testimony of Doctors Good and Barnard is in such conflict with that of Doctor Rosen that the trial court should have sustained the finding of the Industrial Commission, on the theory that there was competent evidence to support a finding either way. It is true there is a contrast between the testimony of the doctors, in that the testimony of Doctors Good and Barnard is definite, that the condition of claimant's ankle in 1948 was not caused by

the accident of 1945, whereas the testimony of Doctor Rosen was merely that there was a possibility that the accident in 1945 could have caused the condition in 1948. We are of the opinion that claimant's medical evidence, standing alone, without considering the testimony of the physicians called by the employer and the carrier, was not sufficient to justify an award of compensation.

This brings us to the question as to whether claimant's own testimony is sufficient to support the award of the commission. His testimony before the referee relates to the fact of having suffered pain since the accident occurred to his foot. He does not say the ankle was broken, and his testimony of having had some discomfort *continuously* since the accident seems to be contradicted by the history he gave Fitzsimons General Hospital when he entered that institution as a patient.

With this unsubstantial evidence before us, we find another factor in the case which we believe makes it necessary to affirm the judgment of the trial court.

It will have been noted that after the Industrial Commission had dismissed the claim in 1946, the employer and insurance carrier had no further notice of claimant's intention to assert any liability against them until October 18, 1948. But this was after the ankylosing operation which had produced the disability which claimant then sought to charge against his former employer. There immediately arises the question whether the employee should not have given notice to his former employer, before the disabling operation was performed, of the former's intention both to submit to such an operation and also to hold his former employer liable for the resulting disability. Certainly there is nothing in the Colorado Workmen's Compensation law that expressly permits such a procedure as was followed here, and the basic theory of Workmen's Compensation Acts in the various states would seem to bar such a procedure. What appears to have been overlooked is the right of the employer to have his own physician make a physical

518

examination and prescribe treatment. As stated in section 193 of Honnold on Workmen's Compensation (1918 ed.), volume 1, page 688: "Since the employer must pay the cost, he is given the privilege of selecting the physician and services requisite to proper treatment." Citing *In re Panaṣuk,* 217 Mass. 589, 105 N.E. 368; *Keigher v. General Electric Co.,* 173 App. Div. 207, 158 N. Y. Supp. 939; *McNamara v. United States Fidelity & Guaranty Co.,* 1 Cal. I.A.C. Dec. 138. And in the discussion of the duty of employers on page 697 of the same volume there appears the statement: "The duty of employers to furnish their own surgeon is a correlative of their right to do so." Citing *Vaughn v. American Coal Co.,* 1 Conn. Comp. Dec. 617.

■ Pertinent portions of section 464, chapter 97, 1945 Cum. Supp. '35 C.S.A. (S.L. '45, p. 441, §22), read: "Any employee claiming the right to receive compensation under this subdivision shall upon the written request of his employer, or the insurer carrying such risk, submit himself at any time and from time to time, to examination by a physician or surgeon, who shall be provided and paid for by the employer or insurer, and shall likewise submit to examination from time to time by any physician or surgeon selected and paid for by the commission. The employee shall be entitled to have a physician or surgeon provided and paid for by himself present at any such examination. So long as the employee, after such written request by the employer or insurer, shall refuse to submit himself to any such examination, or shall in any way obstruct the same, his right to collect or to maintain any proceedings for the collection of compensation under this subdivision shall be suspended, and if he shall refuse to submit to such examination after direction by the commission, or any member or referee thereof, or shall in any way obstruct the same, his right to compensation which shall accrue and become payable during the period of such refusal or obstruction shall be barred and credit given to the

employer for payments which otherwise would have been payable. * * * If he shall refuse to submit to such medical or surgical treatment as is reasonably essential to promote his recovery, his compensation payments shall be suspended entirely. * * * Subject to the contrary direction of the commission in any particular case, the employer shall have the right to select a physician who shall attend and treat an employee and the employer shall not be liable to pay for the services of any other physician or surgeon, * * *."

By not giving advance notice to the employer and the Industrial Commission of his intention to have the disabling operation performed and of his intention to hold his former employer for the resulting disability, claimant has in effect rendered the foregoing provisions nugatory and of no avail. Both employer and Industrial Commission have been barred from the right to have their respective physicians examine claimant and prescribe treatment. He has submitted himself to examination after it is too late to permit the physicians of the employer or of the Industrial Commission to do anything about it. He is in the same position as one who had refused to submit to examination. In either case the right to examination has been denied. "Such a provision has been construed as requiring the employee to submit to a physical examination although the employer is contesting the right of the employee to receive compensation, and as not restricting the right to require such an examination to cases where the employer acknowledges his liability and makes compensation payments." 58 Am. Jur., p. 834, §387. See, also, Anno. 41 A.L.R., 867.

In one respect the facts in the instant case show an even more flagrant ignoring of both the spirit and letter of the statute, in that the X rays of claimant's ankle and foot, taken at the Veterans Hospital preceding the disability operation, were not submitted in evidence, regardless of the attempts of the referee to have them so introduced.

From an examination of this record we cannot escape the impression that had claimant followed the procedure of giving notice of his intended operation to his employer and the commission, that the ankylosing operation might never have been performed and the resulting disability would thus have been avoided. Certainly the temporary immobilizing of the ankle and the building up of the left heel, which relieved the pains in the back, might well have been explained by the fact that the left leg was one and one half inches shorter than the right one. As said by Doctor Barnard, "If the walking cast did that well, why fuse it (tibia talus)."

Unfortunately claimant proceeded on a private arrangement of his own, and attempts now to charge industry with the not too happy results. There appears to be no legal basis to support this attempt.

The judgment is affirmed.

MR. CHIEF JUSTICE HILLIARD dissents.